

**FILED**

Mar 15 2019, 9:07 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Patrick J. Smith
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joe Paul Hambel,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 15, 2019

Court of Appeals Case No.
18A-CR-686

Appeal from the Washington
Circuit Court

The Honorable Larry W. Medlock,
Judge

Trial Court Cause No.
88C01-1608-MR-400

**Najam, Judge.**

# Statement of the Case

Joe Paul Hambel appeals his convictions for two counts of murder, felonies, and one count of criminal trespass, as a Class A misdemeanor, following a jury trial. Hambel presents the following consolidated issues for our review:

1. Whether the trial court abused its discretion when it denied his motion for mistrial based on alleged juror misconduct.

2. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.[1]

# Facts and Procedural History

On August 19, 2016, Hambel approached an officer with the Salem Police Department, Ronald Mays, to discuss Hambel's "concern with drugs" in Washington County, including drug activity at a home where a woman named Valerie Dicus lived. Tr. Vol. 2 at 168. Hambel told Officer Mays that he wanted to become an informant, and he asked Officer Mays "how [Hambel] could help get the drugs out of Washington County." *Id.* Officer Mays told Hambel to contact Salem Police Officer Eric Mills.

---

[1] We held oral argument in this case on February 26, 2019, at Pike Central High School in Petersburg, Indiana. We thank counsel for their excellent advocacy and extend our appreciation to the faculty, staff, and students of Pike Central High School for their hospitality.

[4]     Later that evening, Hambel was out with his neighbor R.J. Sease, and they stopped at a Circle K gas station. Officer Mills was there to investigate a motor vehicle collision at the station. Hambel approached Officer Mills, identified himself, told Officer Mills that he wanted to help "clean up the drug problem in the town," and identified Dicus as "one of the drug dealers that he was wanting to help with." *Id.* at 185. Officer Mills told Hambel that he would call him so that the two could sit down and discuss the matter another time.

[5]     After Hambel and Sease left the gas station, they went back to Hambel's apartment. There, Hambel took Sease to a bedroom and showed him a gun, which Hambel put into a holster "around his ankle." Tr. Vol. 3 at 6. Sease also saw that Hambel had a gun "on his hip." *Id.* at 7. Sease then left the apartment with his girlfriend to run an errand.

[6]     Sease returned to Hambel's apartment a while later, and, at approximately midnight, the two left in Hambel's car, which Hambel wanted to sell to Sease. Hambel drove the car back to the Circle K and bought cigarettes. After that, Hambel drove to a house on Small Street. Hambel parked his car on the street, turned the headlights off, and got out of the car. Sease stayed in the car. After a few minutes had passed, Sease heard gunshots, and then Hambel ran back to the car and got in the driver's seat. Hambel had a gun in his hand, and he told Sease that "he had took [sic] care of one of Washington County's biggest drug problems." *Id.* at 17. And Hambel told Sease that he had just "shot her in the head" and "shot him." *Id.* Hambel then drove back to his apartment. Before

he pulled the car into the parking lot, he told Sease, "[I]f you tell anyone, I've got a bigger [gun] I'm going to use on you." *Id.* at 18.

[7] Logan Shelton, Dicus' half-brother, had been sleeping in his bedroom at his family's house on Small Street when, after midnight on August 20, he was awakened by gunshots. Logan went to the living room to investigate and found Dicus' boyfriend, Joe Hobson, on the floor bleeding and "struggling to breathe." Tr. Vol. 2 at 149. Logan's brother Seth was there, and they decided that they should call 9-1-1. When Logan went for the phone, he saw Dicus motionless on the couch, and he saw "a little pile of blood." *Id.* at 150. Logan then called 9-1-1. Dicus and Hobson were subsequently declared dead as a result of gunshot wounds.

[8] In the early morning hours of August 20, Indiana State Police Detective David Mitchell began investigating the murders, and he quickly learned from Officer Mays about Hambel's interest in Dicus' drug-dealing activity. Accordingly, Detective Mitchell found Hambel at his apartment, told him that he would like to discuss the murders, and transported Hambel to the Washington County Sheriff's Department, where Hambel agreed to give a recorded statement. Hambel initially denied having been at Dicus' house. But he later admitted that he had gone to her house the night of August 19 and "looked in windows." Tr. Vol. 3 at 84. At the conclusion of the interview, Hambel gave Detective Mitchell consent to search his apartment.

[9] Hambel accompanied Detective Mitchell to Hambel's apartment, and Hambel told Detective Mitchell that he could find his 9-mm handgun under the driver's seat of his car. Detective Mitchell secured that handgun. Inside Hambel's apartment, Detective Mitchell found a .32-caliber handgun in an ankle holster on top of a cabinet in the bathroom. Detective Mitchell remembered that there were "several .32 caliber shell casings at the scene" of the murders. *Id.* at 181. Detective Mitchell then transported Hambel back to the Sheriff's Department for a second interview. In that interview, Hambel admitted that he had shot Dicus and Hobson in "self defense." *Id.* at 187. He claimed that he had gone into the house "to scare the s*** out of" Dicus and Hobson and, following a scuffle between Hambel and Hobson for Hambel's gun, the gun went off. *Id.* at 225.

[10] The State charged Hambel with two counts of murder; two counts of felony murder; and burglary, as a Level 5 felony. The State subsequently dismissed the burglary count and added a count of criminal trespass, as a Class A misdemeanor. During the voir dire portion of the ensuing jury trial, a potential juror ultimately seated as Juror 2 engaged in the following colloquy about his familiarity with Hambel and the murders:

> Juror 2:    My wife graduated High School with [Hambel].
>
> State:    Okay and not you, but your wife?
>
> Juror 2:    Yeah.
>
> State:    Do you know . . . him then?

| | |
|---|---|
| Juror 2: | Ah, just through her. |
| State: | Through her, does she, was she a friend . . . |
| Juror 2: | Yeah. |
| State: | . . . close friend? |
| Juror 2: | Yeah, pretty close friends with her. |
| State: | Have you talked with her about this situation then? |
| Juror 2: | Not a lot, no. |
| State: | Okay, have you talked to her about what kind of person he may be? |
| Juror 2: | Yeah. |
| State: | Have you, I don't want you to tell me . . . have you developed any kind of opinions or beliefs about him or the case, based on that conversation? |
| Juror 2: | Yeah, a little. |
| State: | Okay. . . . Do you feel like this may not be the right case for you, given what you know? |
| Juror 2: | Yeah, probably. |

Voir Dire Tr. at 7. The State then moved to strike Juror 2 for cause. Defense counsel asked Juror 2 several questions about his wife's relationship with Hambel, and defense counsel argued that Juror 2 could be impartial. The trial

court agreed and denied the State's motion to strike Juror 2 for cause. Juror 2 was ultimately seated on the jury.

[11] On the morning of the sixth day of the jury trial, the court announced that two jurors had notified the bailiff that "one juror may have had extra judicial conduct with a family member . . . ." Tr. Vol. 4 at 64. The juror in question was Juror 2. Accordingly, the court conducted interviews with several jurors to assess the situation. The first juror the court interviewed stated that he had not heard Juror 2 make any improper comments. The second juror the court interviewed stated as follows:

> Juror: One item is, he comes in to the jury room and continues talking about his wife making comments about the defendant. Somewhat, to my assumption, of course, *I am making an assumption that he's speaking with this about [sic] his wife.*
>
> Defense: And without telling us what was said, is he saying this to the entire group? Are all of the jurors. . .
>
> Juror: I don't think that all of the jurors are hearing it, no. I mean obviously, that's why, there was [sic] a few [of] us that . . .
>
> Defense: Right. Were matters being discussed without all of the jurors present?
>
> Juror: No.
>
> Defense: How would he then have a discussion where only part of the group was here and the entire group was not here?

Juror:      When we go to the jury room everybody talks about, not necessarily things about the case, but just their general conversations about their day or where they are going and things like that.

Defense:    Right. Has [Juror 2] related out loud where you could hear him say that his wife has formed an opinion and provided that opinion to him?

Juror:      Yes.

Defense:    And has he carried that opinion into the jury room?

Juror:      I have, no, no. Has not, no. [sic]

Defense:    When, where and how was he making these expressions to jurors?

Juror:      The jurors that sit in that area, the only thing I recall him saying is talking about his wife and her opinion of what's going on. And that's it.

Defense:    Okay. And does he, is that your impression or understanding that based upon what he's saying is that he's discussing what he's hearing in court with her?

Juror:      That, *that's an assumption that, that I'm making*.

Defense:    And, and that's a fair statement. But, that's your impression, is that. . .

Juror:      That's my impression.

Defense:    . . . that him [sic] and his wife are having a discussion about the case?

Juror: That's my impression, yes.

Defense: And he is quoting his wife as to how and why she's expressing herself to him?

Juror: Not really giving a reason, no, no. *I assume that it's something from the past*.

Defense: Okay. Is he saying that his wife is telling him that she's receiving communications from family members?

Juror: No, no, no, nothing in regards to that. Just basically making a generalized comment about how his wife feels.

Defense: And I assume then that his wife has a firm impression of. . .

Juror: I can't speak for someone else.

Defense: Okay. [Juror 2] is expressing, in his words, that she has a firm impression on these matters?

Juror: I wouldn't say firm impression. I mean, I don't know either one of them so I mean that he's making a statement about how she feels that's all I can tell you.

Defense: Okay. How many times has he made statements in that regard?

Juror: I would say at least three or four times.

Defense: Besides yourself, who are you aware of that may have heard these comments on the jury?

Juror:      [Two other jurors], I believe.  Um, [one other juror] and I believe [one other juror] has heard.  I believe, like I said.  I am definite of the first three, not sure about the fourth.

Defense:    From your observations of [Juror 2], does he appear to have his mind made up?

Juror:      I'm not Nostradamus, I can't predict how he has his mind.

Defense:    Has he expressed any statement to you that would lead you to believe he has his mind made up?

Juror:      I guess it depends how big of a stick his wife wields. I couldn't tell you that, I mean, you know you're asking me questions that I can't, I'm making assumptions and I've probably, maybe assumed too much already.

* * *

State:      Do you have a, is he saying, my wife thinks he's guilty or my wife thinks he's not guilty?

Juror:      Not those words, no.

State:      So what words?

Juror:      She has basically said that Mr. Hambel, this is not Mr. Hambel.

State:      It's not the guy she knew.

Juror:      Yes.

State: Okay, okay. So what he basically said is my wife knows, my wife says she knows him but it's based on something she knew years, years ago of him.

Juror: From my understanding, they, he, he made, I remember him when he was, during jury selection, he stated that . . . the defendant came to his house two years ago, or something like that.

*Id.* at 73-78 (emphases added). After questioning two additional jurors, the court engaged Juror 2 in the following colloquy:

Defense: There has been some concern expressed through the bailiff to the Court and to the attorneys that you may be either having people attempt to approach you to discuss the merits of the case with you or receiving information other than the evidence that has been introduced to the Court. Have you discussed the matters for which you're serving as a juror with anyone besides either the Court, the bailiff or other jurors?

Juror 2: Mmmm, no, I mean coworkers at Wal-Mart come up to me and try to talk to me but I pretty much hush it up pretty quickly.

Defense: Have you discussed this matter with your wife?

Juror 2: Mmmm, no.

Defense: Has your wife attempted to discuss this matter with you?

Juror 2: No, not really.

Defense: Okay. If we were receiving information that suggested you were quoting her to other jurors and that she had expressed an opinion and you carried the opinion into these informal discussions, would that be true?

Juror 2: No.

Defense: Okay. Any idea why someone else would suggest that you're bringing up outside conversations in the course of your informal discussions in the jury room?

Juror 2: No, well my wife went to school with him so that would be one. I have brought up conversations that she's had with him in school.

Defense: Okay. Would that be during times when you were guys were back in the jury room waiting to come back into Court?

Juror 2: Yeah.

Defense: Okay. Has anyone approached your wife in an attempt to communicate with you?

Juror 2: Not that I know of, no.

Defense: Have you carried into those informal discussions her thoughts or her recollections or opinions about Mr. Hambel?

Juror 2: Yeah.

Defense: Tell the Court what those thoughts or recollections may have been.

Juror 2:     Uh, just her opinion of him when they were in school, their friendship, their conversations and that's pretty much it.

Defense:     Were they friends by your understanding when they were in school together?

Juror 2:     Yeah.

Defense:     And you talked about that in jury selection I believe, is that right?

Juror 2:     Yes.

*Id.* at 88-90.

[12]     At that point, Hambel moved for a mistrial "based upon what [he] believe[d] [we]re inappropriate communications that a juror had with a non-witness, in direct violation of the admonitions provided by the Court to the jury." *Id.* at 92. Hambel also moved for a mistrial "based upon the disclosures, most notably from [one particular juror, that] the deliberations ha[d] already commenced." *Id.* After hearing argument, the trial court took the matter under advisement and, after a recess, the court interviewed the remaining jurors. The court admonished each of the jurors not to discuss the interviews with the other jurors. At the conclusion of those interviews, the court denied Hambel's motion for a mistrial. And, without objection from Hambel, the court removed Juror 2 from the jury.

[13]     The jury found Hambel guilty as charged on all five counts. The court entered judgment of conviction on three counts: two counts of murder, felonies; and

one count of criminal trespass, as a Class A misdemeanor. The court then sentenced Hambel to an aggregate term of 121 years. This appeal ensued.

## Discussion and Decision

### *Issue One: Mistrial Motion*

[14] Hambel challenges the trial court's denial of his motion for a mistrial. A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury. *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014). We therefore review the denial of a motion for mistrial only for abuse of discretion. *Id.*

[15] Hambel contends that the trial court abused its discretion when it denied his motion for a mistrial because: (1) the court did not apply a presumption of prejudice when it came to light that Juror 2 "was bringing outside information into the jury room"; (2) in the alternative, the court erred when it concluded that Juror 2 did not commit gross misconduct that probably harmed Hambel; and (3) the court erred when it concluded that the jury had not begun deliberating prior to the conclusion of the parties' submission of evidence. Appellant's Br. at 22. We address only Hambel's first and third contentions, which are dispositive of this issue.[2]

---

[2] We need not address Hambel's contention in the alternative that the trial court abused its discretion when it concluded that Juror 2 did not commit gross misconduct that probably harmed Hambel. As we explain below, the trial court did not make such a conclusion.

## Rebuttable Presumption

[16] In *Ramirez*, our Supreme Court addressed confusion among our courts regarding the presumption of prejudice in cases with alleged tainting of the jury. The Court held as follows:

> Defendants seeking a mistrial [in such cases] are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. *Currin[ v. State]*, 497 N.E.2d [1045,] 1046 [(Ind. 1986)]. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. *See Myers v. State*, 240 Ind. 641, 646, 168 N.E.2d 220, 223 (1960); *Oldham v. State*, 249 Ind. 301, 305, 231 N.E.2d 791, 793 (1967). If the State does not rebut the presumption, the trial court must grant a new trial. On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. Instead, the trial court must apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant. *Henri v. Curto*, 908 N.E.2d 196, 202 (Ind. 2009) (internal quotation marks omitted). But in egregious cases where juror conduct fundamentally compromises the appearance of juror neutrality, trial courts should skip *Currin*'s two-part inquiry, find irrebuttable prejudice, and immediately declare a mistrial. *May[ v. State]*, 716 N.E.2d [419,] 422-23 [(Ind. 1999)]; *Kelley[ v. State]*, 555 N.E.2d [140,] 142 [(Ind. 1990)]; *Woods[ v. State]*, 233 Ind. [320,] 323-24, 119 N.E.2d [558,] 560-61 [(Ind. 1954)]. At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice. *See May*, 716 N.E.2d at 421-22.

*Id.* at 939.

[17] Here, in response to Hambel's motion for a mistrial, and after questioning a few jurors, including Juror 2, about the extra-judicial contact, the trial court stated as follows:

> Well, my . . . analysis is as would be required by *Ramirez*, that two prong test: proof by a preponderance of the evidence that extra judicial information or communications occurred. It seems obvious that [Juror 2] has at least communicated some information or opinion about Mr. Hambel to perhaps, limited members, perhaps all members, but many of them appear to have not paid any attention or didn't hear him. And that the communications occurred and that pertained to a matter pending before the jury. That . . . portion is not obvious to the court. Even if *Ramirez* would indicate that the State does not rebut, but [sic] the presumption, [the] trial court must grant a new trial and on the other hand if the defendant fails to make an initial two part showing the presumption does not apply, instead the trial court must apply a probable harm standard for juror misconduct granting a new trial only if the misconduct is gross and probably harmed the defendant. My analysis is that the communication did not harm the defendant, in fact, it appeared from the court's perception that it may have been trying to help the defendant. So *I find that the communications w[ere] harmless.* Now, I think that it also appears appropriate that, therefore your motion to, for mistrial is denied. . . .

Tr. Vol. 4 at 125 (emphasis added).

[18] On appeal, Hambel first notes that "[t]he trial court's ruling is hardly a model of clarity" and interprets it to mean that the court did not apply the rebuttable presumption under *Ramirez*. Appellant's Br. at 24. We agree that, at first

glance, it is unclear whether the court applied the presumption here. On the one hand, the trial court found that it was "obvious" that the first prong under *Ramirez* was satisfied, and the court then stated that whether the second prong had been satisfied was "not obvious." Tr. Vol. 4 at 125. However, the court concluded that Juror 2's extra-judicial "communications w[ere] harmless," which is a direct reference to the State's burden under *Ramirez* to rebut the presumption.[3] *Id.* Accordingly, the trial court's ruling, when read as a whole, demonstrates that the court properly applied the rebuttable presumption under *Ramirez*, and we reject Hambel's contention that the court erred on this issue.

[19] Further, the evidence is overwhelming that Juror 2's communications to some of the jurors were harmless. Hambel asserts that he was prejudiced by Juror 2's remarks because another juror described Juror 2 as "trying to throw [the jurors] in another direction" while discussing the case. Tr. Vol. 4 at 79. But it is undisputed that Juror 2 communicated only information that was favorable to Hambel. Thus, there is no evidence that Hambel was harmed by the substance of Juror 2's remarks.[4] Hambel concedes that only two or three jurors had even heard Juror 2 remark on his wife's opinions of Hambel. And, after Juror 2 was

---

[3] Hambel asserts that the trial court applied the probable harm standard, but the court only mentioned the probable harm standard in explaining the test under *Ramirez*.

[4] To the extent Hambel contends that he was harmed by the trial court's removal of Juror 2 from the jury because Juror 2 had a favorable opinion of Hambel, Hambel did not object to his removal and cannot now complain.

removed from the jury and replaced, the trial court admonished the jurors as follows:

> I want to remind the jury of the preliminary instructions that the court had previously provided to the jury. As I admonish you, each and every time that you leave, you are not to have any discussions with anyone other than yourselves and only while you're together in the jury room. Only consider that evidence which comes before you in this court room and was admitted by the Court.

Tr. Vol. 4 at 129. There is no evidence that Juror 2's remarks impacted the jurors' ability to remain impartial. In any event, assuming any prejudice to Hambel, we presume that the court's admonishment cured it. *Jones v. State*, 101 N.E.3d 249, 258 (Ind. Ct. App. 2018). The trial court did not abuse its discretion when it concluded that Juror 2's remarks to a few jurors were harmless and denied Hambel's motion for mistrial on that basis. *See, e.g.*, *Weisheit v. State*, 26 N.E.3d 3, 16 (Ind. 2015) (holding trial court did not abuse its discretion when it denied mistrial motion where, after extrajudicial communication to jurors was exposed, court questioned each juror, admonished the jurors, and dismissed the offending juror).

### *Deliberations*

[20] Hambel next contends that the jurors engaged in deliberations "prior to the conclusion of the evidence in the case." Appellant's Br. at 28. In support of that contention, Hambel directs this court to a juror's statement that Juror 2 "was thwarting the jury's deliberations." *Id.* In particular, when asked about

Juror 2's inappropriate remarks about Hambel, one juror said: "[W]e'd be sitting there, deliberating and [Juror 2 would] come off with something to try to get us in another direction." Tr. Vol. 4 at 80. When defense counsel asked that juror to clarify what he had meant by "deliberating," the juror agreed that they were "discussing the evidence that had been presented during the most recent session in court." *Id.*

[21] Indiana Jury Rule 20(a)(8) provides in relevant part that jurors "are permitted to discuss the evidence among themselves in the jury room during recesses from trial when all are present, as long as they reserve judgment about the outcome of the case until deliberations commence." With the promulgation of that rule, our Supreme Court "has unambiguously made a distinction between discussions and deliberations." *Weatherspoon v. State*, 912 N.E.2d 437, 441 (Ind. Ct. App. 2009), *trans. denied*.

[22] The State maintains that there is no evidence that the jurors began deliberations before all of the evidence had been submitted. Indeed, each of the jurors questioned about whether deliberations had begun when the court removed Juror 2 responded that there had only been discussions, but no judgments about the ultimate outcome. We agree with the State and hold that the trial court did not abuse its discretion when it denied Hambel's motion for mistrial on this basis.

## *Issue Two: Sentence*

[23]     Hambel contends that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) provides that "[t]he Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." This court has held that "[t]he advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed." *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017). And the Indiana Supreme Court has explained that:

> The principal role of appellate review should be to attempt to leaven the outliers . . . but not achieve a perceived "correct" result in each case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Defendant has the burden to persuade us that the sentence imposed by the trial court is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind.), as amended (July 10, 2007), *decision clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007).

*Shoun v. State*, 67 N.E.3d 635, 642 (Ind. 2017) (omission in original).

[24]     Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id*. at 1224.

The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[25] With respect to the nature of the offenses, Hambel asserts that, while there were "young persons in the residence" at the time of the murders, "there is no evidence that the young persons did see the offenses, and little evidence that Hambel thought they would see the offenses." Appellant's Br. at 38. And Hambel points out that "it should be considered that the events of August 20 were set into motion by Hambel's serious concerns about drug use and dealing in Washington County." *Id.* With respect to his character, Hambel maintains that: he has no criminal history; despite his PTSD, anxiety, and depression, he has maintained steady employment; and he has two children. Hambel characterizes his character as "excellent." *Id.* at 39.

[26] However, as the State points out, the nature of the offenses supports the 121-year sentence in that Hambel: planned the murders; shot Dicus in the head from close range; shot Hobson six times; and threatened to kill Sease if he told anyone about the murders. As for his character, Hambel may have been motivated to commit these murders by his concern about the drug problem in Washington County and his interest in helping law enforcement. But when he

became a vigilante and took the law into his own hands, he displayed a blatant disrespect for the law, which reflects poorly on his character. We cannot say that Hambel's sentence is inappropriate in light of the nature of the offenses and his character.

[27] Affirmed.

Baker, J., and Brown, J., concur.